UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ELITE AVIATION SERVICE, LLC                    PLAINTIFF/COUNTER-DEFENDANT

v.                                No. 5:19-CV-05134

ACE POOLS, LLC and
TRACY WELCHEL                              DEFENDANTS/COUNTER-PLAINTIFFS

**OPINION AND ORDER**

Plaintiff Elite Aviation Service, LLC ("Elite") has filed multifarious motions now pending before the Court.[1] Before the Court to be resolved by this order are a motion (Doc. 39) to dismiss Defendants' counterclaim as a sanction for intentional spoliation, a motion (Doc. 43) to supplement the motion to dismiss,[2] and a motion (Doc. 45) to supplement the motion to exclude expert testimony. Defendants Ace Pools, LLC ("Ace Pools") and Tracy Welchel (collectively "Defendants") filed a response in opposition (Doc. 48) and brief in support (Doc. 49) of that response to the motion to dismiss their counterclaim as a sanction for intentional spoliation. Elite filed a reply (Doc. 54) with leave of Court. Defendants also filed responses (Docs. 50 & 51) to Elite's motions to supplement. On May 20, 2020, the Court entered a text only order (Doc. 44) granting Elite's motion (Doc. 43) to supplement. For the reasons set forth below, the Court's previous order (Doc. 44) is vacated and the motions (Docs. 39, 43, 45) will be DENIED.

---

[1] Elite has filed a motion for a protective order to reduce expert witness fees, a motion to exclude expert testimony, a motion to dismiss Defendants' counterclaim as a sanction for alleged intentional spoliation, a motion to supplement the motion to dismiss the counterclaim, a motion to supplement the motion to exclude expert testimony, and a motion for an order regarding allocation of fault. This prolific motion practice is unusual for a contract dispute. Since April 13, 2020, Elite has filed 151 pages of motions and briefing, excluding the page count for the numerous exhibits attached to Elite's various motions. Motions not addressed in this order will be addressed by separate orders on later dates.

[2] This motion was previously granted, but the order granting it is vacated and the motion is addressed by this order.

1

**I.      Background**

In 2018, Ace Pools purchased a 1985 Cesena 182 aircraft (the "Aircraft") with tail number N9493X.  Ace Pools is owned by Separate Defendant Tracey Welchel, and according to Mr. Welchel, Ace Pools purchased the Aircraft for business purposes.  After Ace Pools purchased the Aircraft, Mr. Welchel took the airplane to Elite for an avionics upgrade.  Elite's Account Manager Charles Hollingsworth was Mr. Welchel's point of contact with Elite.[3]  Mr. Welchel also hired 12 Stone Aviation ("12 Stone") to perform work on the Aircraft.  Elite also contracted with Dustin Thomas of 12 Stone to perform structural work on the Aircraft.  The relationship between Mr. Welchel and Elite appeared to begin smoothly and Mr. Welchel believed the upgrades to the Aircraft would be complete around November 9, 2018.  However, once it appeared the Aircraft would not be ready by November, Mr. Welchel became frustrated with Elite's services.

On March 9, 2019, Mr. Welchel traveled to Elite's shop to check on the status of the Aircraft but Elite staff were not available to let Mr. Welchel in.  Mr. Welchel contacted Dustin Thompson of 12 Stone and asked Mr. Thompson to transfer the Aircraft to 12 Stone's hangar.  Thompson contacted Elite to warn Elite personnel that Mr. Welchel was angry and on his way to Elite.  As a result of this warning, Elite closed its shop and sent staff home.  Mr. Welchel then broke into Elite's hangar and sent a text message to Hollingsworth saying he was done with Elite.  Following the text message, Mr. Welchel sent a text message to Mr. Thompson directing him to not release the Aircraft to Elite or Mr. Hollingsworth.

On April 1, 2019, Mr. Welchel contacted Brady Terry with Wings Aviation, LLC ("Wings") and asked whether documents were needed from Elite for the Aircraft to be returned to

---

[3] The Court notes it does not have the benefit of Mr. Hollingsworth's deposition because, as of May 26, 2020, Mr. Hollingsworth had yet to be deposed.

2

service.[4] Mr. Terry emailed Mr. Welchel a list of documents needed before Mr. Welchel could fly the Aircraft and stated "one phone call to the [Federal Aviation Administration ("FAA")] would probably resolve all of your issues." (Doc. 39-12, p. 3). Sometime after receiving Mr. Terry's email, Mr. Welchel called the FAA and filed a complaint against Elite. Initially, Mr. Welchel called the FAA office in Oklahoma City but was informed the Little Rock office would be the one to handle the complaint because the work was performed in Arkansas. Because the Aircraft needed to be in Arkansas, Mr. Welchel verified with the FAA that the Aircraft could be taken to Wings.

On April 2, 2019, Mr. Welchel told Elite and 12 Stone that he wanted to take the Aircraft on a test flight. However, instead of taking the Aircraft on a test flight and returning to the hangar, Mr. Welchel flew to Oklahoma City without paying the remainder of his bill to Elite. Elite filed a police report on April 5, 2019, for theft of services.

Upon returning to Oklahoma, the Aircraft was flown multiple times between April 2 and April 29. On April 29, 2019, the FAA issued Mr. Welchel a one-time ferry permit. An FAA ferry permit allows an aircraft to fly to a certain destination despite the aircraft being grounded. The documented purpose of Mr. Welchel's ferry permit was for a repair to the lighting system. Mr. Welchel flew the Aircraft to Wings on April 29. Once the Aircraft arrived, Mr. Terry contacted the FAA to inform them the Aircraft was at Wings. The FAA emailed Mr. Terry with directions to not perform work on the Aircraft until it was released by the FAA, and Mr. Terry testified that he began disassembly of the aircraft at the FAA's request. (Doc. 39-11, pp. 16-17). On May 17, 2019, the FAA sent Mr. Hollingsworth a letter detailing the investigation of Elite's repairs to the Aircraft. Mr. Hollingsworth replied to the letter on May 20, 2019 requesting more information,

---

[4] Although the timeline is unclear, it appears Mr. Welchel's dissatisfaction with Elite led him to research other airplane mechanics in Arkansas and found Wings, which is how is how he got in touch with Mr. Terry.

3

and the FAA supplied Mr. Hollingsworth the requested information via letter on June 28, 2019.

Elite brought suit against Defendants in Arkansas state court on June 20, 2019, alleging breach of contract and conversion claims. Defendants removed the action to this Court and filed counterclaims against Elite for negligence, breach of contract, fraud, and violations of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, et seq.

On May 8, 2020, the FAA issued an emergency order revoking Elite's repair station certificate because of the work Elite performed on the Aircraft. According to the press release, the FAA alleged Elite falsified maintenance records to represent the work performed was in accordance with FAA standards when Elite knew the work did not comply with the standards. Three days after the FAA's press release, Elite filed the motion to dismiss Defendants' counterclaims for intentional spoliation. Elite argued Defendants began intentionally disassembling the Aircraft despite knowing litigation was likely to occur. Six days after filing the motion to dismiss, Elite filed a motion to supplement the motion to dismiss claiming Defendants had failed to produce certain evidence. Elite filed another motion to supplement the following day, requesting to supplement the Daubert motion. In the motions to supplement, Elite represented that Defendants had repeatedly failed to provide discovery information.

**II.    Standard**

"Aside perhaps from perjury, no act serves to threaten the integrity of the judicial process more than the spoliation of evidence." *United Med. Supply Co., Inc. v. United States*, 77 Fed. Cl. 257, 258 (Fed. Cl. 2007). A court has inherent authority to fashion appropriate sanctions for conduct which abuses the judicial process. *Stevenson v. Union Pac. R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004). "A spoliation-of-evidence sanction requires 'a finding of intentional destruction indicating a desire to suppress the truth.'" *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035

(8th Cir. 2007) (quoting *Stevenson*, 354 F.3d at 746).  The "ultimate focus for imposing sanctions is the intentional destruction of evidence *indicating a desire to suppress truth*, not the prospect of litigation."  *Id.* (emphasis added).  "Intent is rarely proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors."  *Id.* (citing *Morris v. Union Pac. R.R.*, 373 F.3d 896 (8th Cir. 2004)).  If the movant shows the spoliation was done in bad faith, the Court may give an adverse inference or dismiss the case.  *Menz v. New Holland N. Am., Inc.*, 440 F.3d 1002, 1006 (8th Cir. 2006).

### III.   Analysis

#### A.   Motion to Dismiss

Elite's motion for dismissal on the basis of spoliation argues that despite Defendants' duty to preserve evidence, Defendants "acted in concert to disassemble and remove each of the various components [of the Aircraft] made subject to this lawsuit."  (Doc. 40, p. 16).  Elite argues Defendants' actions in taking the Aircraft to Wings and Wing's actions in "disassembling the Aircraft, making several complaints to the FAA and to Elite's vendors, and fabricating a lengthy paper trail of unadorned and unsubstantiated hearsay for the purposes of creating evidence to be used at trial" without repairing the airplane demonstrate that Defendants acted in bad faith.  (*Id.* at 17).

There is no dispute that Defendants and Elite knew litigation was likely.  The communications between Mr. Welchel and Elite clearly demonstrate the likelihood of litigation.  However, Elite has not shown that Defendants acted intentionally or in bad faith to suppress the truth.  Despite Elite's portrayal of Defendants as bad faith actors who systematically disassembled the Aircraft to prevent Elite from inspecting it, the evidence before the Court tells a different story.

5

The relationship between Elite and Defendants obviously took a turn for the worse in April 2019, and Mr. Welchel's actions at Elite's hangar, his communications with Mr. Hollingsworth, and his decision to fly the Aircraft back to Oklahoma during a purported test flight reveal Mr. Welchel was an extremely difficult client. The Aircraft was disassembled by Wings after it was delivered by Mr. Welchel. However, because of the FAA investigation, the disassembly at Wings did not begin until representatives from the FAA arrived and directed that disassembly. Mr. Welchel's and Mr. Terry's depositions explain that the FAA worked with Mr. Terry to disassemble the Aircraft during the investigation, going so far as to instruct Mr. Terry at times what to remove. Mr. Terry testified his disassembly of the Aircraft was documented and everything was given to the FAA. Elite received notice of the investigation as early as May 17, 2019, and had contact with the FAA. The FAA investigation did not conclude until May 2020, which explains the year-long disassembly of the plane.

Elite also argues Defendants intentionally spoliated evidence because Mr. Welchel's personal mechanic worked on the Aircraft and this work was not disclosed to Elite. The basis for this argument is that Mr. Welchel's testimony that his own mechanic (and not Wings) worked on the Aircraft was "painfully and reluctantly extracted" and "[t]he fact that Mr. Welchel obfuscated in his testimony is proof positive of both actual intent and bad faith." (Doc. 40, p. 17). The Court disagrees. Mr. Welchel testified that a mechanic did work on the Aircraft, and although there may be a question of fact as to when the actual work occurred, Mr. Welchel's testimony is not "proof positive" of bad faith obfuscation. Mr. Welchel's deposition reveals he had difficulty stating exactly when events happened, which is not inconsistent with what is seen in other cases where testimony is given at a point remote in time from the events at issue. In this case, the deposition was taken in March 2020 concerning events that happened in 2018-2019. The context and

circumstances apparent from the deposition indicate that difficulties in Mr. Welchel's testimony can plausibly be excused as the result of his unclear memory, rather than only being explainable as indicative of intentional destruction and desire to suppress the truth.[5]

This is not a situation where the evidence clearly shows that Defendants directed the disassembly of the Aircraft in an attempt to hide evidence or suppress the truth. Defendants filed a complaint with the FAA, and an investigation commenced in April 2019 in order to uncover if mistakes were made during the avionics upgrade. The FAA directed disassembly of the Aircraft. Elite was informed of the investigation in May 2019. Despite filing suit in June 2019, Elite does not appear to have requested an opportunity to inspect the Aircraft until some time in 2020, or to have asked the FAA to delay the disassembly of the Aircraft until it had completed its own inspection or could be present for some or all of the FAA's investigations. Only following the FAA's press release revoking Elite's repair station certification did Elite claim spoliation.[6] The timing of Elite's inspection request and spoliation motion even lead the Court to wonder if this motion is motivated by Elite's dissatisfaction with the outcome of the FAA's investigation, or by some strategic gamesmanship, rather than by a sudden concern developing a year into litigation that the FAA-directed disassembly of the Aircraft at the center of this dispute was an act of

---

[5] The Court notes that Elite's description of Mr. Welchel's testimony as painful and reluctant may also be explained as much by the aggressive nature of its counsel's questioning as by any accused obfuscation. For example, prior to Mr. Welchel's testimony regarding the mechanic, Mr. Mehdizadegan, counsel for Elite, posed a hypothetical to Mr. Welchel in which Mr. Terry "murdered [Mr. Welchel's] entire family." (Doc. 39-1, p. 31). Mr. Mehdizadegan also later argued with Defendants' counsel over a form objection, and the transcript of that argument reveals some degree of frustration was felt by deposition attendees. (Doc. 39-1, pp. 57-58). Testimony given during frustrating and contentious depositions may tend to be painful and reluctant even when it does not reflect an attempt to hide the truth.

[6] The Court notes Elite's motion in this Court did not disclose the FAA's finding or press release, which was made three days prior to the motion. There can be no little explanation for not disclosing this fact other than to misrepresent this important fact to the Court.

intentional bad faith by Defendants. Based on the FAA investigation and the record, there is insufficient evidence for the Court to find that Defendants acted intentionally to suppress the truth when they had the Aircraft disassembled. Because Elite has not shown that Defendants intended to suppress or destroy evidence, Elite's motion to dismiss as a sanction for spoliation will be denied.

### B. Motions to Supplement

Elite also filed a motion to supplement the spoliation motion and a motion to supplement the motion to exclude Defendants' expert. The motions to supplement stated Defendants produced numerous discovery documents after Elite's "extensive and repeated efforts to obtain good-faith supplementation and under threat of a motion to compel." (Doc. 43, p. 1). According to Elite, on May 18, 2020, Defendants produced over 1,600 pages of previously withheld discovery documents that supported two of Elite's pending motions. Defendants, however, argue the discovery produced was largely duplicative of previous productions and was produced again because Elite continued to claim documents had not been given.

Elite's motions ask to supplement seven exhibits to the motion to dismiss and thirteen exhibits to the motion to exclude expert testimony that Elite alleges were not available to it at the time of the motions were filed. Although the Court previously granted the motion to supplement the motion to dismiss, closer inspection reveals the exhibits do not provide any additional substantive support to Elite's motion to dismiss. Elite's second motion to supplement also does not provide any substantive support to its motion to exclude Defendants' experts. Instead, it appears to the Court that Elite has chosen to file multiple motions, none of which are motions to compel, implying discovery misconduct by Defendants without making a good faith effort to

resolve any of these alleged discovery issues.[7]  If Elite was "extremely concerned that additional discoverable evidence exists but has not—and likely will not, without the Court's attention—be produced," Elite's attention is directed to the Amended Final Scheduling Order (Doc. 26) explaining the process for resolution of discovery disputes.  Elite's motion (Doc. 45) to supplement the motion to exclude Defendant's expert is denied.  Further, the Court will vacate its previous order (Doc. 44) granting the motion to supplement (Doc. 43) Elite's motion to dismiss and the motion to supplement (Doc. 44) will be denied.

## IV.　Conclusion

IT IS THEREFORE ORDERED that Elite's motion to dismiss (Doc. 39) and motion to supplement (Doc. 45) are DENIED.  The Court's previous order (Doc. 44) is VACATED and Elite's motion to supplement (Doc. 43) is DENIED.

IT IS SO ORDERED this 22nd day of June, 2020.

/s/ P. K. Holmes, III
　　　　P. K. HOLMES, III
　　　　U.S. DISTRICT JUDGE

---

[7] The Final Scheduling Order (Doc. 26) states a "good faith effort means, at a minimum, an in-person or telephone conversation with opposing counsel."  Nowhere in the motions to supplement or responses is there mention of a phone call or in-person conversation.  Instead it appears Elite's counsel has largely made these requests through e-mail.  In the Court's experience, in-person or telephone conversations are more effective than textual communication alone, as ambiguities in requests or responses can be immediately clarified or explained, and discovery disputes resolved, without the need for the Court to intervene.