IN THE UNITED STATE DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ELITE AVIATION SERVICE, LLC          PLAINTIFF/COUNTER-DEFENDANT

VS .                        NO. 5:19-CV-05134-PKH

ACE POOLS, LLC; and                DEFENDANTS/COUNTER-CLAIMANTS
TRACY WELCHEL

### PLAINTIFF/COUNTER-DEFENDANT'S UPDATED TRIAL BRIEF

Plaintiff/Counter-Defendant Elite Aviation Service, LLC (Elite), by its attorneys, CROSS, GUNTER, WITHERSPOON & GALCHUS, P.C., offers its Updated Trial Brief as required by the Court's Second Amended Final Scheduling Order, stating:

### I.    SUMMARY OF CASE

The salient facts and circumstances applicable to this case have been exhaustively presented in the motions previously submitted in this matter, so the following is offered in condensed form.

At the center of this litigation is a 1985 Cessna 182R aircraft bearing tail number N9493X (Aircraft). Ace Pools, LLC (Ace), acting in all respects through its manager, Tracy Welchel (together "Counter-Claimants"), purchased the Aircraft from Tony Plant of Southern Wings Aviation in early 2018 for $129,000. Ace is a pool-building company that provides services within an approximate 100 to 130-mile radius of its business location in Oklahoma. Welchel is the manager of Ace, which is ultimately owned by a Colorado trust called Chugach Holdings. Welchel is a new pilot and he has no instrument rating, which means he is only permitted to operate an aircraft under visual conditions.

In September 2018, before Welchel ever received a private pilot's license, he hired Elite as well as Buckland Aviation, LLC (12 Stone) to perform certain upgrades on the

256962                            1

Aircraft's avionics—with Elite, as a then-certified repair station working on the avionics, and 12 Stone (which employs Dustin Thompson, an airframe and powerplant mechanic with an inspection authorization (A&P/IA)) performing all other work incident to the upgrade.

After Welchel delivered the Aircraft to Elite—which was located across the runway from 12 Stone—the scope of work changed several times and there were disagreements between the parties about the length of time necessary to complete the work. On or about March 18, 2019, before Elite could finish its work, these disagreements reached a boiling point and Welchel "fired" Elite and directed that the Aircraft be transferred to the custody and control of 12 Stone. Nevertheless, even after Welchel formally terminated Elite's services, he continued to have Elite work on the Aircraft under 12 Stone and Mr. Thompson's supervision. Ultimately, while reportedly conducting a "test flight," Welchel flew away with the Aircraft on April 2, 2019, without paying their final bill of approximately $62,000.00—costs incurred for both labor and parts. Notably, given the condition of the Aircraft at that time, and because Welchel demanded the return of the Aircraft's maintenance records, Elite contacted the Federal Aviation Administration (FAA) for guidance in completing the maintenance records. Elite complied with the FAA's directive and returned the Aircraft to service subject to and for the limited purpose of conducting a maintenance check flight.

Initially upon retrieving the Aircraft, Welchel's only identified concerns regarding the operation of the Aircraft involved its autopilot system, an item about which Elite revealed some known issues and which it was prepared to address following the maintenance check flight. Specifically, the autopilot disconnected during the alleged test flight because its power was drawn from an auxiliary power source instead of a primary

256962                                    2

source, but this minor "squawk" or punch-list correction was easily correctable and was not capable of obvious ascertainment without the benefit of a test flight. Rather than allowing Elite an opportunity to address and correct this or any other "squawk," Welchel flew away with the Aircraft, stating: "I will go through the bill and either fly back to get the kinks out or I will call you and we will discuss it." The evidence at trial will show that Welchel did neither.

Instead, Welchel and his agents continued operating the Aircraft for the remainder of the month—not for any business purposes but simply for his private interests or as personal favors for his friends. Before he ever arrived to take the Aircraft, however, Welchel contacted a competitor of Elite relative to his dissatisfaction with Elite. That competitor, Brady Terry of Wings Aviation, advised Welchel to call the FAA to complain about Elite, which he did. After taking the Aircraft back to Oklahoma and enjoying the work performed by Elite for approximately one month, Welchel then decided to request a ferry permit to fly the Aircraft back to the Wings Aviation facility in Fayetteville, Arkansas. Based on Welchel's complaint, the FAA contacted Wings and purportedly directed Brady Terry, Wings' manager, to disassemble the Aircraft.

While some of the modifications made by Elite were alleged to be out of compliance with manufacturer specifications or FAA regulations, the items attributable to Elite did not create a danger and were easily remediable through additional paperwork, an FAA Form 337 or field approval by a designated engineering representative. There were other items of concern to the FAA, but Elite denies that those items—many of which involve pre-existing conditions to the Aircraft's structure—are attributable to its work, and there is neither proof nor competent expert testimony to establish that any issues identified by the FAA with regard to this thirty-five-year-old Aircraft were the result of actions taken

by Elite. Moreover, Elite was represented by separate counsel in the FAA certificate enforcement action, who withdrew Elite's appeal given the costs of proceeding with protracted litigation. The Court properly excluded documents regarding the FAA and NTSB's enforcement action because the public records exception to the rule against hearsay does not apply. *Dkt. 120*. Notably, alleged violations of the Federal Aviation Regulations (FARs) do not give rise to a cause of action. Indeed,

> there is no private, federal cause of action for the violation of the FAR. *See Glorvigen v. Cirrus Design Corp.,* 2006 WL 399419, at *6 (D.Minn. Feb. 16, 2006) ("**The FAA does not provide an express federal remedy for a violation of standard of care**."); *In re Air Crash at Lexington, Kentucky, August 27, 2007,* 486 F.Supp.2d 640, 656 (E.D.Ky.2007) **("[T]he federal aviation statutes do not provide a private cause of action**.").

*West v. A & S Helicopters*, 751 F. Supp. 2d 1104, 1107 (W.D. Mo. 2010) (emphasis added).

When it became apparent that Welchel had no intention of paying the final balance of approximately $62,000, Elite filed a police report on April 9, 2019 for theft of services, to which Welchel reacted by addressing Charles Hollingsworth, Elite's then-manager, as follows: "You are one dumb, worthless fuck!!! MY TERMS ARE OFF!!!" With the declaration that his "terms [were] off[,]" Elite filed a collection suit in state court alleging breach of contract and conversion for failure to pay the outstanding balance. Counter-Claimants then removed this lawsuit and counterclaimed against Elite with causes of action for negligence, breach of contract, fraud, and deceptive trade practices, all in connection with the same underlying set of operative facts: that Elite allegedly harmed the Aircraft during its portion of the avionics installation. The Court has granted, in part, Elite's motion for summary judgment and dismissed other corporate entities as well as the causes of action for fraud and deceptive trade practices.

Because the parties have reached a tentative agreement whereby Counter-Claimants will stipulate to the existence of the debt and their failure to pay the outstanding balance of approximately $62,000, the predominating issues remaining for trial concern Counter-Claimants' allegations of negligence and breach of contract. Elite respectfully submits that Counter-Claimants will not be able to meet their burdens of proof and production on either remaining claim. And although the Court denied summary judgment as to Welchel's individual breach of contract claim, Welchel testified multiple times that he has no personal claim against Elite. Trial would proceed in a more orderly fashion if Counter-Claimants stipulated to the dismissal of Welchel's individual claims, leaving only Elite and Ace Pools as the parties in this action.

Similarly, Counter-Claimants' position suffers considerably due to their undeniable unclean hands. It is axiomatic that, to the extent there were repairs that needed to be addressed, Welchel could and should have given Elite a chance to remedy them. He refused to do that. Further, Welchel flew the Aircraft and had other work performed on it during the weeks after retrieving it and before subjecting it to an invasive and destructive disassembly. Elite was never invited to observe the Aircraft's disassembly.

Rather than taking exception to specific aspects of the work performed by Elite and allowing it to address them, Welchel chose to have the Aircraft dismantled and has tried to hold Elite responsible for virtually every facet of the 35-year-old Aircraft that is no longer in new-from-the-factory condition. He has made broad and staggeringly vague allegations of problems and deficiencies that he cannot conclusively attribute to Elite, and he ignores the reality that he is dealing with a 35-year-old airplane that had a long history with the Civil Air Patrol, an entity known for making modifications to its aircraft, and selling them at the conclusion of their heavy use. While Welchel may allege that the

Aircraft was "grounded" by the FAA, the Court can take judicial notice of the FAA registry which identifies no restrictions on the Aircraft's operation. *See* https://registry.faa.gov/aircraftinquiry/NNum_Results.aspx?NNumbertxt=N9493X (last accessed May 24, 2021).[1] Even if the Aircraft was grounded, however, it also likely that if Welchel had not decided to pursue an FAA complaint, any deficiencies with the Aircraft could have been quickly and easily remedied, whether by Elite or another facility, without delay. Notably, there is no evidence available regarding the condition of the Aircraft at the time that it was removed from Arkansas on April 2, 2019.

If Counter-Claimants could meet their burden on liability—they cannot—they have still failed to produce the proof of damages necessary to succeed on either of their remaining causes of action. Because this is essentially a property damage dispute, the measure of damages is well settled. Since the modifications, even if technically deficient, have not rendered the Aircraft a total loss, "**the owner is entitled to recover the difference in the fair market value of the property immediately before and immediately after the damage occurred**. . . . [T]he fair market value is defined as the price the property would bring between a willing seller and a willing buyer in the open market after negotiations." *Southern Club Enterprises, Inc. v. United States*, 2012 WL 3596126, at *12 (W.D. Ark. Aug. 21, 2012), *aff'd in part, rev'd in part and remanded*, 529 F. App'x 806 (8th Cir. 2013) (emphasis added). Welchel had only recently purchased the Aircraft for a price of $129,000.00 and he paid about $51,000 of the invoiced costs of about $113,000.00 for upgrades. Therefore, even if the Aircraft had been a total loss, the maximum damages could not plausibly exceed $170,000.00.

---

[1] It should be noted that the Aircraft's registration with the FAA expired on May 8, 2021, apparently because Counter-Claimants failed to renew same.

Ignoring the measure of damages applicable to a case such as this, Counter-Claimants have instead presented testimony from an aircraft appraiser to the effect that the Aircraft had an appraised value of $349,150.29 at the time it was retrieved, but also had a diminished value of $0.00. To further the paradox, both numbers are allegedly based on the fact that Elite performed upgrades to the Aircraft. It is also significant that the appraiser did his mystical math calculation without ever actually inspecting, or even viewing, the Aircraft and after reviewing only 4 pages of this 35-year-old airplane's voluminous maintenance records. The evidence at trial will confirm that Counter-Claimants' expert relied on information supplied by counsel to form his opinions, and that he relied on a definition of fair market value that is contrary to Arkansas law. As odd as this may be, perhaps the blow most fatal to the appraiser's valuation opinion is his own affirmative declaration that *it is no longer valid*. As he testified, "[his] report is good from the report date [February 5, 2020] for 30 days; and **it can't be relied on after that, absolutely**." Effectively, Counter-Claimants have had no damages proof since March 6, 2020. Whatever evidentiary weight the Court may otherwise afford the appraiser's dubious opinions should be substantially undercut by his suspect credibility—both in his methods and in his character. Likewise, the appraiser presented no Rule 26 complaint report in this case (he says he was not asked to), a fact that the Court previously held that it would keep "in mind pursuant to Fed. R. Civ. P. 37(c)(1)(C)" at trial. *Dkt. 96.*

Despite the incredible deficits in proof of damages, Welchel and his expert invite reversible error by suggesting—perplexingly—that the Court should depart from the well-settled standard for damages to personal property and instead enter a total award of $24,700,000.00. How do they arrive at this number? Elite remains utterly befuddled. Again apparently treating the Rules as mere suggestions, Counter-Claimants have refused

to produce any actual calculation of their damages as required under Rule 26 of the Federal Rules of Civil Procedure and as requested in Elite's discovery requests. In fact, the first time Elite ever received even the benefit of a bottom-line damages amount was in their response to Elite's motion for summary judgment. There, they demanded $950,000 in unspecified actual damages, with an additional $23,750,000.00 in punitive damages. In context, only 0.52% of Counter-Claimants' claimed damages reflect the Aircraft's purchase price ($129,000.00 ÷ $24,700,000.00 = 0.0052 × 100 = 0.52%).

Viewing the issues through a more realistic lens, it is submitted that the actual damages, even if the alleged deficiencies listed in the appraiser's report are accepted as correct, would be below $18,000 based on the estimated costs of repair addressed by Dave Kocher, Elite's expert. Mr. Kocher's testimony in this respect is entirely proper. The only other timely reflection of the potential costs of repair are reflected in an unauthenticated July 16, 2019, quote from Rose Aircraft, which Counter-Claimants secured through their agent, Brady Terry. While it may be inadmissible, it is noted that it was prepared shortly after Welchel retrieved the Aircraft on April 2, 2019. As such, it would rebut Counter-Claimants' more recent demands.

In any event, there are no special or consequential damages available that would allow Welchel an opportunity to recover his desired windfall, or in this case, jackpot. There has been no allegation of special circumstances and it is well-settled that to be liable for special damages,

> there must not only be knowledge of the special circumstances, but such knowledge 'must be brought home to the party sought to be charged under such circumstances that he must know that the person he contracts with reasonably believes that he accepts the contract with the special condition attached to it.' In other words, (where there is no express contract to pay such special damages), the facts and circumstances in proof must be such as to make it

> reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part.

*Bank of Am., N.A. v. C.D. Smith Motor Co.*, 353 Ark. 228, 241, 106 S.W.3d 425, 431 (2003) (citing *Hooks Smelting Co. v. Planters' Compress Co.*, 72 Ark. 275, 79 S.W. 1052, 1056 (1904)).

Stripped from Counter-Claimants' hollow rhetoric and voracious demands, the trial of this action will establish that Elite's work on the Aircraft was performed in a workman like manner. In addition to the benefit of Mr. Kocher's expert testimony that will bring a much-needed degree of pragmatism to the realities of the work performed by Elite, the Court will hear testimony directly from the mechanics who worked on the Aircraft—Charles Hollingsworth, Seth Martin, and Robert Carver. Because these individuals are no longer employed by Elite, which has ceased operations, they are not biased to keep their jobs and their truthful testimony will establish Elite's entitlement to a full defense verdict on the remaining counterclaims. The Court will also hear testimony that, if liability is found, 12 Stone's fault should be apportioned accordingly.

## II. LEGAL AND EVIDENTIARY ISSUES

Only the claims of negligence and breach of contract remain for trial. Counter-Claimants' allegations of breach of contract are wholly unsupported, and in any event, the claims sound in tort rather than contract. Elite performed work on the subject Aircraft in accordance with what was requested, although not at the speed that Welchel demanded. Welchel retrieved the Aircraft without affording Elite an opportunity to make final corrections of any issues discovered. Instead, he complained to the FAA and hired Elite's primary competitor, Brady Terry, to "repair" the Aircraft. However, Wings did not undertake to repair a single item on the Aircraft. Instead, it significantly dismantled the

Aircraft and the component parts at issue—all without Elite's knowledge or participation, and to the extreme detriment of Elite's ability to defend itself from these claims.

Elite will present testimony that although one lighting component was not specifically approved for use on the Aircraft in a supplemental type certificate, any error in this regard was attributable to the layout on the parts manufacturer's website when viewed using Internet Explorer, and the lighting component did not render the Aircraft unsafe for flight. Resolution of same could have been accomplished through a routine field approval or another documentary alternative; or the lights could simply be removed for approximately $2,000.00. Notably, however, Welchel testified that the lighting-related issues are not part of his claims in this lawsuit.

Elite vigorously denies that it caused any structural damage to the Aircraft and, specifically, it denies that it drilled any hole in the engine firewall or otherwise in the Aircraft's former/bulkhead. Elite's position is that any such holes were pre-existing in this 35-year-old aircraft. Counter-Claimants have identified no causation expert, structural expert, or expert in metallurgy to competently testify about causation, and there is a dispute as to who caused damage, if any, to the Aircraft, and when such damage arose. And Elite will contest the authenticity of a photograph that purports to reflect the interior of the subject Aircraft.

Relatedly, there is a factual dispute as to whether Plaintiffs can prove their damages. They failed to comply with their obligations under Rule 26 with respect to providing a computation of damages, and their damages expert, Jason Zilberbrand—an aircraft appraiser who has never testified as an expert in any matter prior to this litigation but who has been found to have lied under oath in two different courts—has never

inspected or even seen the Aircraft. Finally, there is a fact question as to the extent to which repairs, if any, are required; and if so, the cost of such repairs.

Finally, there is a lingering fact question as to whether and to what extent the alleged fault should be allocated among responsible third parties who also worked on the aircraft during the relevant times. Specifically, 12 Stone had possession and performed work on the Aircraft; and Dustin Thompson performed this work on behalf of 12 Stone as well as in his individual capacity. Additionally, John Story, an FAA employee, made repairs and modifications after Welchel retrieved possession of the Aircraft.

From the evidentiary standpoint, the key may lie more in what is excluded than what is introduced. The various invoices and communications between the parties are clearly relevant, as are *certain* photographs that can be properly authenticated. However, it is anticipated that Counter-Claimants will also attempt to present a catalogue of materials prepared by a lay witness who has since enjoyed an obvious pecuniary benefit by eliminating the only competitor aircraft avionics facility in the relevant market. The claims asserted in the Counterclaim relate to allegedly deficient installation of add-on components to the Aircraft, which are state law claims. Even if compliance with a FAR is implicated, it does not call the FAA investigation into play in this matter. However, no FAR is being contested, and furthermore, "neither federal aviation statutes nor the corresponding regulations provide a private cause of action for injuries of the types Plaintiffs allege in their complaint." *Bennett v. Southwest Airlines Co.*, 2006 WL 1987821, at *3 (N.D. Ill. July 13, 2006), *rev'd and remanded*, 484 F.3d 907 (7th Cir. 2007). Accordingly, such items have no direct relevance to this matter and would be unduly prejudicial, so they should be excluded. The prejudicial nature of Brady Terry's materials, and particularly photographs from his destructive disassembly, will be self-evident when

objections are advanced at trial. The photographs do not reflect the complained-of condition of the Aircraft, and they are largely irrelevant while being substantially prejudicial.

### III.    PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Findings of Fact

1.    Ace Pools, LLC is a pool-building company that services clients in a 100-mile radius of its location in Oklahoma.

2.    Ace Pools, through its agent, Mr. Tracy Welchel (Counter-Claimants), purchased a used 1985 Cessna 182 aircraft bearing tail number N9493X (Aircraft) in early 2018 for $129,000 from Southern Wings Aviation. [Stipulated Fact. *See Dkt.* 111]

3.    Southern Wings performed no pre-purchase inspection of the Aircraft. [Stipulated Fact. *See Dkt.* 111]

4.    Counter-Claimants cannot recall performing a pre-purchase inspection of the Aircraft, and they have supplied no evidence demonstrating that such an inspection was ever conducted. [Stipulated Fact. *See Dkt.* 111]

5.    Southern Wings did not sell the Aircraft to Ace Pools, LLC at any discount. [Stipulated Fact. *See Dkt.* 111]

6.    The Aircraft was previously owned and operated as a Civil Air Patrol (CAP) unit. [Stipulated Fact. *See Dkt.* 111]

7.    CAP performed many different types of modifications to this Aircraft so that it could tow gliders.

8.    Mr. Welchel had the Aircraft titled in the name of Ace Pools, LLC, a single member LLC. [Stipulated Fact. *See Dkt.* 111]

9.    Mr. Welchel is the member, but not the owner of Ace Pools.

10.     Chugach Holdings, LLC, a Colorado limited liability company, owns Ace Pools.

11.     Mr. Welchel is not the title owner of the Aircraft.

12.     Mr. Welchel has never used the Aircraft as part of the business of Ace Pools, LLC, but instead used it for his private pilot lessons without payment to Ace Pools, LLC. [Stipulated Fact. *See Dkt*. 111]

13.     Mr. Welchel never told Southern Wings that he was purchasing the Aircraft for any business purpose.

14.     At all relevant times to this litigation, Charles Hollingsworth served as manager of Elite. [Stipulated Fact. *See Dkt*. 111]

15.     Mr. Welchel never told Elite's representatives that he purchased the Aircraft for any business purpose.

16.     Mr. Welchel never told Elite's representatives that he intended to use the Aircraft for any business purpose.

17.     Mr. Welchel obtained his pilot's license in October 2018. He has no instrument rating on his personal pilot's license.

18.     Counter-Claimants hired Elite and Buckland Aviation, LLC d/b/a 12 Stone Aviation (12 Stone) to upgrade the Aircraft's avionics in or about November 2018.

19.     During the relevant time period of this action (November 2018 through April 2, 2019), Elite was authorized by the FAA to operate as a certified repair station.

20.     Welchel knew that 12 Stone would perform work on the Aircraft that was beyond the scope of Elite's authority as a certified repair station because 12 Stone has at least one A&P mechanic on its staff, including Dustin Thompson, who also holds an inspection authorization.

21.     Elite provided an estimate for the work requested by Mr. Welchel before beginning any work.

22.     Elite's estimate provides in pertinent part as follows:

> The material and labor, which I have authority to order, listed at your regular prices, is ordered by me. I agree to pay in full when work is complete. This bill unpaid shall constitute a lien on this aircraft as set forth in A.C.A. 18-45-201 et seq of the laws of Arkansas. I agree to pay interest, collection costs, reasonable attorney's fees and hereby waive all rights to claim exemption under state laws if a collection is made by suit or otherwise. I also agree that you will not be held responsible for aircraft, articles left in aircraft or parts left with you, in case of fire, accidents, theft or other causes beyond your control. My aircraft is test flown after work is completed at my own risk. I fully accept and submit myself to the jurisdiction of the Washington County Arkansas courts should judicial proceedings be initiated.
>
> ***
> Final payment due at installation completion.
> ***
> I agree to the terms and conditions of this estimate and acknowledge that more extensive labor and materials may be incurred. I authorize the expenditure of labor and material as is needed. I shall pay for any such expenditure. Estimate for labor, materials and parts which are readily apparent. Estimate valid for 30 days.

23.     At no time did Mr. Welchel discuss the usage of the Aircraft for a business purpose and at no time did Elite acknowledge or accept an obligation for any special or consequential damages.

24.     In November 2018, Mr. Welchel caused the Aircraft to be delivered to Elite, even though Elite was not ready to undertake the work due to prior commitments to other customers.

25.     Elite suggested that Mr. Welchel take back the Aircraft until it was ready to begin its work. Mr. Welchel declined to do so.

26.     Elite ordered expensive avionics equipment per Mr. Welchel's request and performed avionic upgrades on the Aircraft consistent with his direction.

27.     The scope of work changed at various points and Mr. Welchel's levels of satisfaction with the timeliness of the work ebbed and flowed.

28.     In March 2019, during one of Mr. Welchel's periods of dissatisfaction, he fired Elite and directed the Aircraft's physical removal from Elite's hangar to 12 Stone's hangar across the runway. Notwithstanding this change, Mr. Welchel requested that Elite continue with its modifications and Elite complied, albeit at the 12 Stone facility and only under Mr. Thompson and 12 Stone's supervision. [Stipulated Fact. *See Dkt.* 111]

29.     Mr. Thompson never identified any deficiencies in Elite's work during the relevant time period.

30.     Mr. Thompson and 12 Stone supervised Elite's work during a portion of the relevant time period, particularly from March 18 through April 2, 2019.

31.     Mr. Thompson never identified any deficiencies in his own work, or the work of 12 Stone, during the relevant time period.

32.     Mr. Thompson installed all brackets for the autopilot system in his personal capacity.

33.     12 Stone removed and reinstalled all engine control cables, removed the Aircraft's vacuum system, and installed new pitch-trim control cables.

34.     On or about April 1, 2019, Mr. Welchel called Elite to demand all paperwork necessary to retrieve the Aircraft. [Stipulated Fact. *See Dkt.* 111]

35.     Elite then consulted with the FAA as to how the paperwork should be completed under the circumstances, particularly in the absence of a test flight, and prepared it according to the FAA's instruction.

36.     Elite cleaned the Aircraft's internal compartments with an air hose and vacuum before Mr. Welchel retrieved the Aircraft.

37.     On April 2, 2019, Mr. Welchel appeared at 12 Stone with John Story, an FAA employee who, in his personal capacity, serves as Ace Pools' mechanic.

38.     Mr. Welchel discussed the state of the modifications with Mr. Hollingsworth when he arrived on April 2, and Mr. Hollingsworth advised of a continuing issue with the new autopilot.

39.     Mr. Welchel and Mr. Story proceeded to take the Aircraft up for what was thought to be a test flight, but rather than return to discuss the results with Mr. Hollingsworth, they proceeded to Oklahoma.

40.     The autopilot issue created no safety concern as it could have simply been turned off and flown manually.

41.     Further, Mr. Story examined the Aircraft and found it safe to fly.

42.     Mr. Story testified that he did not see any other issues when he flew back to Oklahoma with Mr. Welchel.

43.     During the flight to Oklahoma, Mr. Welchel texted Mr. Hollingsworth to report that he would consider what aspects he would pay on his outstanding bill of nearly $62,000. [Stipulated Fact. *See Dkt.* 111]

44.     Counter-Claimants made no further payments against the outstanding balance.

45.     After Elite reported Welchel to the Springdale Police Department for theft of services, Welchel told Hollingsworth that he was a "dumb, worthless fuck" and that Welchel's "TERMS [WERE] OFF." [Stipulated Fact. *See Dkt.* 111]

46.     Counter-Claimants owe a bill to Elite for $61,973.82.

47.     By April 1, 2019, Mr. Welchel had made a separate contact with Brady Terry of Wings Aviation in Fayetteville to ask what documentation he needed to obtain when he retrieved his plane.

48.     Mr. Terry provided the information and advised Mr. Welchel to contact the FAA.

49.     Mr. Welchel contacted the FAA and lodged a complaint about the work of Elite.

50.     Elite had no notice of the complaint or of the subsequent FAA investigation until approximately May 19, 2019. Even then, it was not invited to participate in the examination of the Aircraft.

51.     The FAA never asked any questions of Elite's representatives.

52.     Between April 2, 2019 and April 26, 2019, Mr. Welchel and others operated the Aircraft for personal use. In addition, certain repairs were performed on the Aircraft by John Story.

53.     John Story's repair work is not initially identified in the Aircraft's maintenance records, and a maintenance log book entry was only produced after Elite identified this issue during this litigation.

54.     At Mr. Welchel's request, the Aircraft was flown to Wings in Fayetteville for the purpose of removing interior lighting under an FAA-issues ferry permit requested and authored by John Story.

55.     When he contacted Wings in late April 2019, Mr. Welchel told Mr. Terry that he had concerns with "some autopilot issues." [Stipulated Fact. *See Dkt.* 111]

56.     Mr. Terry was advised that the Aircraft was subject to a FAA investigation. [Stipulated Fact. *See Dkt.* 111]

57.     FAA investigators came to Fayetteville and directed Mr. Terry to begin dismantling the Aircraft so they could complete an examination pursuant to Mr. Welchel's complaint. [Stipulated Fact. *See Dkt*. 111]

58.     As early as May 2, 2019, the FAA authorized Mr. Terry "to proceed in conducting the maintenance to return the aircraft to service meeting its Type Design."

59.     However, no repair action was taken.

60.     Terry did not "have specific costs of what that is going to take" to repair the Aircraft. [Stipulated Fact. *See Dkt*. 111]

61.     Again on June 6, 2019, the FAA advised Mr. Terry, "any lighting that was not installed in compliance with FAA Approved Supplemental Type Certificate for that make/model aircraft and all Lighting systems that are installed with non-PMA/TSO articles need to be removed and or replaced with PMA/TSO parts before further flight." Those were the only instructions or limitations imposed by the FAA regarding repairs to the Aircraft.

62.     As of March 11, 2020, although Mr. Terry had done research for a cost estimate for completing the required maintenance, he had not been able to complete it because "there's still too many variables." [Stipulated Fact. *See Dkt*. 111]

63.     The FAA investigation did not prevent Mr. Welchel or Ace Pools from conducting repairs or calculating damages.

64.     Welchel specifically advised Wings that he did not want any repairs performed on the Aircraft.

65.     After Mr. Welchel took the plane and refused to pay his bill, Elite filed suit in the Circuit Court of Washington County, Arkansas alleging breach of contract and

conversion to collect on the outstanding and acknowledged debt. [Stipulated Fact. *See Dkt.* 111]

66.     Mr. Welchel and Ace Pools removed the action to federal court and filed a counterclaim against Elite in which they alleged negligence, breach of contract, fraud, and deceptive trade practices, all in connection with the same underlying set of operative facts: that Elite allegedly harmed the Aircraft during its avionics installation.

67.     Prior to April 2, 2019, Mr. Welchel told Elite that he was going to take the Aircraft whether or not the work was complete.

68.     Elite was prohibited from completing its work because Mr. Welchel took the Aircraft before the maintenance check flight was performed and thus before Elite could address any remaining punch-list items, commonly referred to as "squawks" in the aviation industry.

69.      To the extent they had issues with the work, Counter-Claimants did not notify Elite of the issues and they otherwise failed to afford Elite an opportunity to address them.

70.     Elite discussed the fact that the autopilot was not functioning properly on April 2, and Elite expected an opportunity to correct that issue, before Counter-Claimants flew away with the Aircraft.

71.     Elite had a contractual expectation that the Aircraft would be test flown before the work and installation was complete.

72.     Because of the simultaneous investigations conducted by Terry and the FAA, during which the Aircraft was systematically dismantled, Elite was never afforded an opportunity to inspect the Aircraft in its complained-on condition.

73.     Wings' disassembly changed the condition of the Aircraft and altered its condition because there were no metal shavings in the interior compartments of the Aircraft before it left Arkansas on April 2, 2019, and there were metal shavings present in photographs taken by Mr. Terry over the year-long disassembly.

74.     Mr. Terry drilled holes in the Aircraft during his disassembly.

75.     Elite's expert witness, David Kocher, was never afforded an opportunity to inspect the Aircraft in its original complained-of condition.

76.     No individual is capable of competently assessing whether or to what extent the Aircraft was subject to any actual damage due to Elite's work because Wings uninstalled the components at issue and generally disassembled all relevant portions of the Aircraft.

77.     Elite did not drill any holes into the Aircraft's engine firewall or its bulkhead.

78.     Charles Hollingsworth, Seth Martin, and Rob Carver are the only individuals employed by Elite who performed work on the Aircraft.

79.     Charles Hollingsworth, Seth Martin, and Rob Carver denied drilling any holes in the Aircraft's bulkhead or the engine's firewall.

80.     Dustin Thompson installed the complained-of rivets on the Aircraft.

81.     After his deposition, Dustin Thompson admitted to Charles Hollingsworth that he never witnessed Mr. Carver drill any holes in the Aircraft.

82.     The complained-of holes in the Aircraft predated Elite's work on the Aircraft.

83.     Neither 12 Stone nor Thompson's work is reflected in the Aircraft's maintenance logbook. [Stipulated Fact. *See Dkt*. 111]

84.     No executed logbook entry was affixed to the Aircraft's maintenance logbook for the post-April 2 work completed by Mr. Story. [Stipulated Fact. *See Dkt.* 111]

85.     Neither Mr. Welchel nor Ace Pools could identify a contract term or a breach of such a term. Their complaint is simply that "[Elite] made modifications that were not in compliance with FAA regulations or manufacturer's specifications."

86.     The only allegation of breach of contract by Ace Pools, LLC against Elite is that "they did not install the avionics per the STCs."

87.     STCs are not contracts, they are supplemental type certificates that allow for the installation of after-market parts. [Stipulated Fact. *See Dkt.* 111]

88.     Neither Mr. Welchel nor Ace Pools have or can provide any evidence that Elite's work was performed negligently. Although Mr. Terry claimed to find several conditions, he could not confirm a causal connection between them and the work of Elite.

89.     There are no confirmed deficiencies with the Aircraft that were uncorrectable or that presented any issue with the actual operation of the Aircraft at the time it left the control of Elite.

90.     The deficiencies alleged by Mr. Welchel and Ace Pools as existing on April 2, 2019, could have been repaired for less than $17,000.

91.     Mr. Welchel and Ace Pools have alleged damages but have not produced adequate or acceptable proof which is an essential element of the claim. When there has been a total loss of property such that there is no salvage value or no possibility of repair, the owner is entitled to recover the fair market value of the property immediately before the loss occurred, but no such fair market value has been determined. Moreover, when the property is not a total loss but is only damaged, the owner is entitled to recover the

difference in the fair market value of the property immediately before and immediately after the damage occurred, but no such difference has been calculated.

92.    Counter-Claimants failed to present a computation of damages alleged as required by Rule 26 of the Federal Rules of Civil Procedure.

93.    Counter-Claimants failed to present a computation of damages alleged in response to Elite's discovery requests.

94.    To date, Counter-Claimants have failed to present any computation of their alleged damages.

95.    To date, Counter-Claimants have failed to present any expert report as required by Rule 26 of the Federal Rules of Civil Procedure.

96.    Jason Zilberbrand, Counter-Claimants' proposed expert, testified that his appraisal reports were intentionally not submitted as Rule 26 expert reports.

97.    Mr. Welchel has vacillated between $0 and $350,000 as to the value of the Aircraft that he bought for $129,000, all based solely on the opinions of his hired appraiser, Jason Zilberbrand.

98.    Jason Zilberbrand's appraisal methods are unsupported in the aircraft appraising industry.

99.    Jason Zilberbrand's application of his alleged appraisal methodology is not worthy of credence.

100.    Jason Zilberbrand is a known perjurer and his testimony is untrustworthy.

101.    Before Elite began work on the Aircraft, Counter-Claimants insured its value at $140,000.00. [Stipulated Fact. *See Dkt*. 111]. This amount was $1,000.00 more than the original asking price, or $11,000.00 more than the actual purchase price of $129,000.00.

102.    While Elite was performing the avionics upgrade, Counter-Claimants increased the insured value of the Aircraft to $200,000.00. [Stipulated Fact. *See Dkt*. 111]. This increase in coverage was made in December 2018.

103.    Wings secured a quote for repairs from Rose Aircraft with respect to all structural items as well as paint on Counter-Claimants' behalf on July 16, 2019, the total of which was estimated at $13,050.00.

104.    Regarding his opinions, Mr. Zilberbrand stated that his "report is good from the report date [February 5, 2020] for 30 days; and it can't be relied on after that, absolutely." [Stipulated Fact. *See Dkt*. 111]

105.    Tony Plant, the individual who sold the Aircraft to Mr. Welchel, testified that the Aircraft sold for $129,000, that he has never seen a similar Cessna 182 sell for more than $145,000 and that the appraised value contained in the Zilberbrand report is "about twice as excessive as it should be."

106.    Counter-Claimants failed to produce any evidence or proof that the loss of use of the Aircraft has negatively impacted business operations.

107.    Mr. Welchel testified that he wanted someone else to "take the hit" on an avionics upgrade.

108.    Mr. Welchel admitted that "once I got my license to use it for the business, it went into the shop; so I haven't used it for—that one for business yet."

109.    Neither Mr. Welchel nor Ace Pools have or can show that there has been any business loss with the requisite "reasonable certainty."

110.    There are no set of figures available and any such calculation would be totally dependent on speculation.

111.    Neither Mr. Welchel nor Ace Pools have purchased a similar Aircraft for use in connection with Ace's pool-building business.

112.    Pool construction equipment cannot reasonably be transported in the Aircraft.

113.    Brady Terry has no personal knowledge of the work Elite performed on the Aircraft. [Stipulated Fact. *See Dkt*. 111]

114.    Jason Zilberbrand never inspected the Aircraft.

115.    To date, Jason Zilberbrand has still never seen the Aircraft.

116.    Mr. Zilberbrand's opinions are formed on only an "extremely limited" analysis of the Aircraft's records, including only four pages of logbook entries.

117.    Counter-Claimants have no proof that Elite acted negligently.

118.    Counter-Claimants have produced no contract to support their breach of contract claim.

119.    Mr. Welchel threatened to make Charles Hollingsworth's life a "living hell." [Stipulated Fact. *See Dkt*. 111]

120.    Mr. Welchel threatened to kill Charles Hollingsworth or otherwise to "beat his ass," "rip [him] to pieces," make his life "a living hell," and to "F [him] up." [Stipulated Fact. *See Dkt*. 111]

121.    Mr. Hollingsworth had reason to be afraid of Mr. Welchel.

122.    To the extent the work performed was negligent, which Elite denies, its fault should be apportioned among Mr. Thompson and 12 Stone.

123.    Dustin Thompson admitted that 12 Stone was responsible for the complained-of structural work on the Aircraft, including the installation of a bracket, the

use of CherryMax rivets, and the removal and reinstallation of various engine control cables.

124.   Mr. Welchel knew that 12 Stone and Dustin Thompson performed work on the Aircraft.

125.   Mr. Welchel knew that the work 12 Stone and Dustin Thompson performed on the Aircraft could not be performed by Elite.

126.   Mr. Welchel paid Dustin Thompson and 12 Stone directly for their work on the Aircraft.

127.   Mr. Welchel required 12 Stone and Dustin Thompson to supervise Elite's work on the Aircraft from March 18 through April 2, 2019.

128.   Elite did not have possession, custody, or control of the Aircraft from March 18 through April 2, 2019.

**B.    Conclusions of Law**

1.    Jurisdiction is proper in this Court. The parties are diverse and the amount in controversy alleged in the Counter-Claim exceeds the minimum required for federal jurisdiction on these purely state-law claims.

2.    There are three parties and four claims in this action. Each party's claims are discussed in turn.

### *Elite's Claims Against Counter-Claimants*

3.    Elite presents two claims: breach of contract and conversion, both of which form the basis of its collection action for the unpaid debt of $61,973.82. To state a cause of action for breach of contract, Elite must prove "the existence of an enforceable contract between the plaintiff and defendant, the obligation of the defendant thereunder, a violation by the defendant, and damages resulting to the plaintiff from the breach."

*Hiscox Dedicated Corp. Member Ltd. v. Taylor*, 2020 WL 1933639, at *3 (W.D. Ark. Apr. 21, 2020). Elite has satisfied its burden of proof establishing breach of contract. The contract between the parties is identified by the written estimate and subsequent invoices. Under the contract, Elite performed an avionics upgrade, and in exchange, Counter-Claimants were obligated to pay Elite for the work performed. Elite performed its work and Counter-Claimants failed to pay the debt owed under the contract. Under Arkansas law, specifically Ark. Code Ann. § 16-22-308, the prevailing party in a civil action to recover for breach of contract "may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs." Accordingly, Elite is asking for such an award.

4.      To prove a claim for conversion, Elite must establish by a preponderance of the evidence that Counter-Claimants "wrongfully committed a distinct act of dominion" over Elite's property in a manner that was a denial of or is inconsistent with its rights. *Integrated Direct Mktg., LLC v. May*, 495 S.W.3d 73, 75 (Ark. 2016). Elite presented proof that it purchased parts for the Aircraft and performed unpaid labor in the performance under its contract. Elite would prevail on its conversion claim based on the evidence presented and the parties' stipulations, but because Elite prevails on its breach of contract claim, Elite may only recover under one theory pursuant to the election-of-remedies doctrine. Elite would be entitled to all attorneys' fees spent in recovering possession of the converted property in the event Elite is only successful on its conversion claim. *McQuillan v. Mercedes-Benz Credit Corp.*, 331 Ark. 242, 251 (1998).

### Counter-Claimants' Claims Against Elite

5.      Counter-Claimants have two surviving causes of action against Elite: breach of contract and negligence. Before addressing the substance of their claims, it is first necessary to consider Mr. Welchel's capacity to sue.

6.     Mr. Welchel does not profess any ownership interest in the Aircraft and he has no private interest in this litigation. His claims arise solely based on his agency with Ace, and consequently, Mr. Welchel cannot succeed on either claim. Mr. Welchel testified at his deposition that he has no personal claim against Elite. Thus, a judgment must be entered in Elite's favor as to Mr. Welchel's individual claims.

7.     With respect to Ace's claims against Elite, the present case sounds in tort rather than contract. The claims are for negligence with the installation of the ordered components. There are no specific allegations of a breach of a particular contract term and the allegations do not refer to a specific contract or term. Ace has not established the elements necessary to recover under a breach of contract theory. Ace has not identified an enforceable contract, a breach by Elite, and most importantly, any damages resulting from such breach. To the extent Ace purports to advance a breach of contract claim premised on a violation of the FAA's regulatory requirements, this theory is foreclosed because there is no private cause of action that arises out of the FAR. *West v. A & S Helicopters*, 751 F. Supp. 2d 1104, 1107 (W.D. Mo. 2010).

8.     In any event, Ace's breach of contract claim must still fail because rather than allow Elite an opportunity to address and correct the issues identified after retrieving the Aircraft, Ace kept the Aircraft and used it for several weeks before taking it to a third party. A party "must within a reasonable time after he discovers or should have discovered any breach notify" the other party of the alleged breach or "be barred from any remedy." ARK. CODE ANN. § 4–2–607(3)(b). Ace refused to allow Elite any opportunity to cure and otherwise it failed to provide any notice of the alleged breach. Having failed in this obligation, Ace is barred from a remedy.

9.     Ace is also unable to establish its claim of negligence by a preponderance of the evidence. Negligence "is the failure to do something that a reasonably careful person would do, or the doing of something that a reasonably careful person would not do." *Schubert v. Target Stores, Inc.*, 2010 Ark. 466, 4, 369 S.W.3d 717, 719 (2010). "[A] negligent act arises from a situation where an ordinarily prudent person in the same situation would foresee such an appreciable risk of harm to others that he would not act or at least would act in a more careful manner." *White River Rural Water Dist. v. Moon*, 310 Ark. 624, 626, 839 S.W.2d 211, 212 (1992). To prevail on a claim of negligence, a plaintiff must prove: (1) that the defendant owed a duty to the plaintiff, (2) that the defendant breached that duty, and (3) that the breach was the proximate cause of the plaintiff's damages. *Branscumb v. Freeman*, 360 Ark. 171, 179, 200 S.W.3d 411, 416 (2004).

10.     Under Arkansas law, negligence is never presumed; it must be proved. *Kansas City, S. & M. R. Co. v. Summers*, 45 Ark. 295, 298 (1885). In fact, there is a rebuttable presumption against negligence. *Id*.; *see* AMI 603. Just as negligence is not presumed, negligence is not inferred from a mere fact of property damage. *See* John Wesley Hall, Jr., *Negligence and Comparative Fault*, 3 TRIAL HANDBOOK FOR ARK. LAWYERS § 55:2 (2019-2020 ed.). "Negligence is not imposed in the absence of proof. Conjecture and speculation, however plausible, cannot be permitted to supply the place of proof." *Id*.

11.     While Elite had a duty of care at least until March 18, Ace cannot establish that Elite breached any such duty as compared to a reasonable mechanic under the circumstances, particularly in light of Ace's termination of Elite's services on March 18, 2019 and its agent's repeated threats of physical harm against Elite's employees. Ace's

claims are further undercut because a reasonably prudent mechanic, with the FAA's A&P IA designation, observed Elite performing a portion of the work and found nothing objectionable.

12.     Ace has provided no proof of specific deficiencies by Elite that have damaged the subject Aircraft. Ace further cannot prove that Elite proximately caused Ace's alleged damages to the Aircraft. Proximate causation is an essential element for a cause of action in negligence. *Neal v. Sparks Reg'l Med. Ctr.*, 2012 Ark. 328, 8, 422 S.W.3d 116, 121. "Proximate cause means a cause which, in a natural and continuance sequence, produces damage and without which the damage would not have occurred." *Moon*, 310 Ark. at 627, 839 S.W.2d at 212. "Although proximate causation is usually a question of fact . . ., where reasonable minds cannot differ, a question of law is presented for determination by the court." *Neal*, 2012 Ark. 328 at 8, 422 S.W.3d at 121. Failure to present evidence on proximate cause is fatal to a negligence claim. *Id*. Arkansas law "requires more than a mere possibility that certain injuries resulted from negligence; rather, a reasonable probability must be established." *Arthur v. Zearley*, 337 Ark. 125, 135, 992 S.W.2d 67, 73 (1999). Thus, proof of causation must rise above the level of speculation and conjecture. *Id*. In other words, proof on causation "must be such that a reasonable person might conclude that it is more probable than not that an event was caused by the defendant." *Id*. The fact-finder cannot be "left to speculation and conjecture in deciding between two equally probable possibilities." *St. Paul Fire & Marine Ins. Co. v. Brady*, 319 Ark. 301, 306, 891 S.W.2d 351, 353–54 (1995). Ace leaves the Court with nothing but speculation and conjecture because there is no competent evidence to support its allegations regarding the condition of the Aircraft when it arrived and left Elite's custody.

13.     It is axiomatic that avionics installation is a matter beyond the ken of layman, making expert testimony necessary. *See, e.g., Meza v. Ford Motor Co.*, No. 2:11-CV-02069, 2012 WL 1570040, at *2 (W.D. Ark. May 1, 2012). Not only does Ace present no proof of causation, it failed to identify an appropriate expert, so it is wholly unable to offer any expert testimony on causation to establish that Elite's work was the proximate cause of the alleged property damage. Ace specifically presents no proof to demonstrate that the alleged property damage was not a pre-existing condition of this 35-year-old retired Civil Air Patrol Aircraft.

14.     Even if Ace could establish that Elite breached a duty of care and that Elite proximately caused Ace's alleged injuries, Ace's claims must still fail for at least two more reasons. First, Ace assumed the risk of loss under the circumstances when it took the Aircraft before the work was completed. Second, Ace's negligence claim fails because it cannot present proof sufficient to establish any measure of ascertainable damages.

15.     Regardless, even if a property loss were to exist, the law in Arkansas regarding the measure of damages for a property loss is well-settled and sets the ceiling far below Ace's demands. "When there has been a total loss of property such that there is no salvage value or no possibility of repair, the owner is entitled to recover the fair market value of the property immediately before the loss occurred. *Southern Club Ent., Inc. v. United States*, 2012 WL 3596126, at *12 (W.D. Ark. Aug. 21, 2012), *aff'd in part, rev'd in part and remanded*, 529 F. App'x 806 (8th Cir. 2013) (citation omitted). Where there is no total loss, as here, the appropriate measure of property damage is "the difference in the fair market value of the property immediately before and immediately after the damage occurred." *Id.* (citation omitted). "In both situations, the fair market value is defined as the price the property would bring between a willing seller and a willing buyer

in the open market after negotiations." *Id.* (citation omitted); *see also Daughhetee v. Shipley*, 282 Ark. 596, 600, 669 S.W.2d 886, 888 (1984) (same).

16.    Ace's expert, Jason Zilberbrand, presents conflicting and uncredible testimony regarding the Aircraft's fair market value using an inapposite measure of damages. Mr. Zilberbrand's report also failed to comply with Rule 26 of the Federal Rules of Civil Procedure, and his testimony must therefore be disregarded under Rule 37's self-executing sanction.

17.    Rule 26 further requires a party to provide "a computation of each category of damages . . . including materials bearing on the nature and extent of injuries suffered." FED. R. CIV. P. 26(a)(1)(A)(iii). These computations "should provide sufficient detail to enable the defendant to understand the contours of its potential exposure and make informed decisions regarding settlement and discovery." *Jones v. Wal-Mart Stores, Inc.*, 2016 WL 1248707, at *3 (D. Nev. Mar. 28, 2016). Ace did not adequately comply with this requirement, and Rule 37's mandatory sanctions would provide an adequate basis on which to enter judgment in Elite's favor on Ace's negligence claim. In any event, Ace still failed to present any adequate proof of damages, and a defense verdict should thus be entered in Elite's favor.

18.    Further, there was no business loss. Not only has Mr. Welchel admitted that the Aircraft was never used in the business, it is also true that Ace did not provide any other information to show how and to what extent an Aircraft has ever been used in its swimming pool construction business that only operates within a limited radius of approximately 100 to 130 miles. It is well settled that "proof of lost profits must be shown by evidence which makes it reasonably certain what the party claiming them would have made." *First Serv. Corp. v. Schumacher*, 16 Ark. App. 282, 284, 702 S.W.2d 412, 414

(1985) (citations omitted). This evidence must make the lost profits "reasonably certain" and should be "remove the question of profits from the realm of speculation and conjecture." *Id.*

19.     Regarding the claim for consequential damages,

> Arkansas law follows a minority rule known as the "tacit agreement" rule. To recover consequential damages on a contract, the plaintiff must prove the defendant knew at the time he entered the contract that his breach would cause the plaintiff to suffer special damages, and that the defendant "tacitly agreed" to assume responsibility for those damages. In the absence of an express contract to pay special damages, 'the facts and circumstances in proof must be such as to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part.' Whether notice of any such special circumstances was given to the breaching party is a question of fact.

*Washington Reg'l Med. Ctr. v. Raber*, 2018 WL 5307624, at *3–4 (W.D. Ark. Oct. 26, 2018) (citations omitted). There has been no such evidence in this case. There being no tacit agreement and no indication that Elite knew at the time it agreed to do the work that a deficiency would cause the Ace to suffer special damages, nor any proof to make it reasonable for the trier of fact to believe that Elite tacitly consented to be bound to more than ordinary damages in case of any fault on its part, there can be no consequential damages.

20.     To the extent Ace may prevail on either claim, Ace's damages must be reduced to offset the debt owed to Elite by $61,973.82. Further, because the complained-of work was performed by both 12 Stone and Mr. Thompson, and otherwise under their supervision, such damages must be apportioned proportionally among them.

21.     Ace's damages award, if any, must otherwise be limited by its own failure to mitigate damages.

22.     Finally, Ace's failure to sustain its burden of proof with respect to actual damages should end the Court's analysis. However, Ace is seeking punitive damages without any regard for the applicable law in an amount that shocks the conscience and bears no relationship with Elite's rights to due process. In that regard, the Arkansas Supreme Court has clearly articulated the well-settled standard:

> This court has said that an award of punitive damages is justified only where the evidence indicates that the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred. *Stein v. Lukas,* 308 Ark. 74, 823 S.W.2d 832 (1992); *Missouri Pacific Railroad v. Mackey,* 297 Ark. 137, 760 S.W.2d 59 (1988); *National By Products, Inc. v. Searcy House Moving Company, Inc.,* 292 Ark. 491, 731 S.W.2d 194 (1987). **In other words, in order to superadd this element of damages by way of punishment, it must appear that the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in his course with a conscious indifference to the consequences, from which malice may be inferred**. *Mackey,* 297 Ark. at 145, 760 S.W.2d at 63, *National By Products, Inc.,* 292 Ark. at 494, 731 S.W.2d at 196. In order to warrant a submission of the question of punitive damages, there must be an element of willfulness or such reckless conduct on the part of the defendant as is equivalent thereto. *Dalrymple v. Fields,* 276 Ark. 185, 188, 633 S.W.2d 362, 364 (1982)(quoting *Hodges v. Smith,* 175 Ark. 101, 298 S.W. 1023 (1927)).

*D'Arbonne Const. Co. v. Foster*, 354 Ark. 304, 308, 123 S.W.3d 894, 898 (2003) (emphasis added).

Ace has failed to present any proof that would even remotely suggest the requisite types of wanton or malicious acts or intent on the part of Elite, and thus Ace is not entitled to any punitive damages award.

Respectfully submitted,

M. Stephen Bingham (83023)
Abtin Mehdizadegan (2013136)
**CROSS, GUNTER, WITHERSPOON**
**& GALCHUS, P.C.**
500 President Clinton Ave., Suite 200
Little Rock, AR 72201
(501) 371-9999
(501) 371-0035 FAX
sbingham@cgwg.com
abtin@cgwg.com