UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ELITE AVIATION SERVICE, LLC                       PLAINTIFF/COUNTER-DEFENDANT

v.                                   No. 5:19-CV-05134

ACE POOLS, LLC and
TRACY WELCHEL                                     DEFENDANTS/COUNTER-PLAINTIFFS

**OPINION AND ORDER**

    This matter came before the Court on June 14, 2021, for a bench trial on Elite Aviation Service, LLC's ("Elite") complaint (Doc. 3) against Ace Pools, LLC ("Ace Pools") and Tracy Welchel for breach of contract and conversion. Elite demanded $62,473.82 on its claims. Ace Pools and Welchel's counterclaims (Doc. 21) for breach of contract and negligence were also before the Court. Ace Pools and Welchel demanded damages in excess of $300,000.00 on their counterclaims. Before trial, the Court granted in part (Doc. 103) Elite's motion for summary judgment and dismissed Defendants' counterclaims for fraud and Arkansas Deceptive Trade Practices Act violations. The parties stipulated to some exhibits received into evidence, and the Court overruled the parties' objections to certain exhibits that were also received into evidence. The Court heard the testimony of ten witnesses and then took the case under submission. Having considered the testimony of the witnesses and the exhibits received into evidence, and made credibility determinations on the evidence, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

**I.    Findings of Fact**

    Ace Pools is a limited liability company specializing in swimming pools, spas, waterfalls, water features, pergolas, pavilions, and outdoor kitchens. Tracey Welchel, manager of Ace Pools, started Ace Pools in 2000 and oversaw all projects and day-to-day operations. Ace Pools

historically only served the Oklahoma City, Oklahoma metro area because it was difficult to supervise job sites outside the metro area. In 2017, after multiple requests for Ace Pools to perform work out of the metro area, Ace Pools decided to purchase a plane. Welchel believed a plane would allow him to fly to Ace Pools's out-of-town projects multiple times a week to supervise the progress.

Ace Pools, through Welchel, looked at several airplanes and eventually purchased a 1985 Cessna 182R Skylane, tail number N9493X ("the Aircraft") for $129,000.00 from Southern Wings Aircraft in Oklahoma City. The Aircraft had previously been a Civil Air Patrol ("CAP") plane. Southern Wings purchased the Aircraft from the CAP and overhauled the engine, stripped and painted the Aircraft, and installed new Cessna leather interior. Southern Wings did not update the avionics. When Ace Pools purchased the Aircraft, Welchel was in the process of obtaining his pilot's license. Because Welchel was not an experienced pilot, he wanted updated avionics equipment to make the Aircraft safer and easier to fly. Welchel researched different avionics shops and found Twelve Stone Aviation ("Twelve Stone") and Elite, in Springdale, Arkansas. Twelve Stone and Elite both performed aviation maintenance.

The Federal Aviation Administration ("FAA") requires aircraft mechanics and repair shops to have certifications for different types of repairs. Elite had a repair station certification, which allowed Elite to install avionics. Twelve Stone did not have a certification to install avionics, but did have an airframe and power ("A&P") mechanic on staff. A&P mechanics are certified to perform sheet metal work and drill into the exhaust system. Many A&P mechanics also have an Inspection Authorization ("IA") certification that allows them to perform annual inspections. To repair or perform upgrades, mechanics look to service documents, maintenance manuals, and service manuals. If a mechanic wants to deviate from the original certificate of the aircraft, a

2

supplemental type certificate ("STC") is required. The STC is a detailed document explaining what can be changed. Repairs made outside the original certificate and without an STC can be approved through a Designated Engineering Representative ("DER") or a Designated Air Worthiness Representative ("DAR").

Welchel first called Twelve Stone but Twelve Stone could not completely install the autopilot systems Welchel wanted because Twelve Stone did not have the appropriate FAA designation. Because Twelve Stone could not install the avionics, Welchel chose Elite for the Aircraft upgrades. In July 2018, Welchel first communicated with Charles Hollingsworth. Hollingworth was the production control manager and chief inspector at Elite, as well as a technician and salesperson. Hollingsworth and Welchel began discussions of potential upgrade packages for the Aircraft. Hollingsworth pitched three different packages, with estimates ranging from $30,000 to $98,000. Welchel selected the $56,000 estimated package. The estimate, prepared by Elite on September 4, 2018, totaled $56,395.00 and included the following equipment and services: G5 ATT, G5 HIS W/GAD29B, Garmin GTN750 GPS/NAV/COM, Custom Instrument Panels, Reverse engraved black Lexan circuit breaker labels, Garmin GMA 350C audio panel Bluetooth/audio playback 4 place intercom, flush mount for dual G5 indicators, GTX 345 Panel Mount, GAE12 Encoder, Garmin GNC 255A NAV/COM, GI106B Indicator, Electronics International CGR-30P Premium primary engine monitoring system, Trutrak Autopilot with full installation, Carb Temp Sensor, Amp Sensor, Misc. Wiring, low coax cable, coax connectors, and 122 hours of labor. (Ace Ex. 6, p. 4-5).

Welchel and Hollingsworth agreed Welchel would pay most of the invoice up front in order to have the Aircraft finished as quickly as possible. Welchel believed it would take four weeks for the upgrades, however, no specific end date was discussed or agreed. Welchel paid Elite

$46,025.00 on September 14, 2018.  The Aircraft arrived at Elite on November 9, 2018.  Though Welchel and Elite originally agreed on a Trutrak autopilot system, after the Aircraft arrived at Elite, there were issues with getting an STC from Trutrak to install it in the Aircraft.  The issues with the Trutrak caused delays in Elite's work on the Aircraft.

Welchel remitted a $5,000 payment to Elite on November 12, 2018, for 61 hours of various labor.  After the initial agreement Welchel also requested USB installation in the Aircraft.  On December 12, 2018, Welchel paid a $2,000 invoice for the USB components.  Because of the time delay in installing a Trutrak, on December 22, 2018, Welchel told Hollingsworth to change the autopilot from the Trutrak to a Garmin 500 autopilot system.  Welchel had already paid $7,500 for the Trutrak autopilot and installation, and Elite credited this payment towards the Garmin 500.  A January 25, 2019, invoice charged Welchel $10,243.00 for installation of the Garmin autopilot system.  The $7,500 Trutrak credit was applied and a $2,743.00 balance remained unpaid.  Welchel and Hollingsworth maintained communication about the Aircraft upgrades throughout January and February, during which Welchel repeatedly inquired about the status of the upgrades.  Welchel also decided on several additional upgrades that were not in Elite's original estimate.  One upgrade—suggested by Hollingsworth—was to install a UMA lighting system in the Aircraft.  The cost to install the system, including Elite's labor, was $25,103.21.

The UMA lighting system required a circuit breaker panel to be installed in the Aircraft. Elite installed the circuit breaker panel on the pilot's side of the firewall that had previously housed a vacuum pump system.  Elite drilled two holes into the firewall to hold the circuit breaker panel. Elite also drilled holes into the bulkhead, through which Elite ran wires.  The lighting system was not approved in the original certificate for installation in the Aircraft and the lighting system STC

only allowed for installation in a King Air aircraft. The holes drilled into the firewall and bulkhead were also not approved through any type of certificate.

On February 20, 2019, Hollingsworth told Welchel via text message that the Aircraft would not be ready because the engine monitoring system had to be sent back to the manufacturer. Welchel responded to Hollingsworth's message on February 21 that the upgrades had taken "2 months too long" and that Hollingsworth needed to give a specific finish date or Welchel would "cut [his] losses and come get [his] plane." (Elite Ex. 25, p. 17). On February 22, Welchel sent another text to Hollingsworth asking what upgrades were left on the plane and again stated that he wanted a finish date or he would come get the Aircraft. Hollingsworth responded on February 25 that the Aircraft would be finished the week of March 9 and explained Elite still had to install the circuit breaker panel and the autopilot system. On March 7, Hollingsworth texted Welchel that the Aircraft would not be ready the weekend of March 9, but instead would be ready the next weekend.

On March 16, 2019, Welchel went to the Springdale Airport to check on the status of the upgrades. Hollingsworth was informed Welchel was coming to view the Aircraft and that Welchel was angry. Because of Welchel's anger, Hollingsworth told his staff to go home and closed the hangar. An unknown person at the Springdale Airport let Welchel into Elite's hangar, where Welchel saw the Aircraft was disassembled and Elite's work was unfinished. Welchel sent Hollingsworth a text message and said the Aircraft would be leaving Elite's hangar the next week. Welchel then had the Aircraft moved to Twelve Stone's hangar, where Elite continued to perform work on the Aircraft.

On March 27, 2019, Elite emailed Welchel the estimates, invoices, and credit memo. Elite prepared a $53,860.82 invoice for the light system and other upgrades. On April 1, 2019, Welchel

told Hollingsworth he would pick up the Aircraft on April 2. Welchel asked if his paperwork would be ready, and Hollingsworth stated the paperwork was not complete because a test flight had to be performed. On April 2, Welchel flew to Twelve Stone to pick up the Aircraft. Elite had completed all upgrades by April 2, 2019. Despite the installation of an uncertificated lighting system and uncertificated holes in the bulkhead and firewall, Elite did not seek a DER or DAR field certification to return the aircraft to service with the modifications. Elite represented the Aircraft was complete, but there was an issue with the autopilot. Prior to Welchel's arrival, Elite ran several self-fail tests as directed by Garmin. When Welchel arrived, everything appeared to be working correctly on the ground.

Elite's standard test flight practice was for the owner to perform the test flight or for Elite to help the owner find a pilot to perform the test flight. Welchel had John Story and Shelton Whitehead accompany him to Elite to perform the test flight. Hollingsworth filled out the necessary paperwork and the logbook entry stated there would be a "[m]aintenance check flight due for the installation of the equipment that was installed . . . ." (Elite Ex. 41, p. 1). Story and Whitehead took the Aircraft on the first test flight. During the test flight the autopilot tripped and the GPS would not connect. Once the Aircraft landed, Hollingsworth told Welchel the circuit breaker needed to be reset. Story, Whitehead, and Welchel took the Aircraft on a second test flight while Hollingworth remained on the ground. The autopilot again tripped. Upon landing after the second test flight, Welchel discovered Hollingsworth had left. Welchel, Story, and Whitehead waited for approximately twenty minutes for Hollingsworth to discuss the issues, but Hollingsworth never returned. Welchel, Story, and Whitehead then flew the Aircraft back to Oklahoma City.

On April 6, 2019, the Aircraft was flown from Oklahoma City to Wellington, Kansas and back. The Aircraft was also flown on April 14, 20, and 28. On April 24, Welchel applied for a ferry permit from the FAA to fly the Aircraft to Wings Aviation in Fayetteville, Arkansas. A ferry permit is a one-time permit granted by the FAA to allow a pilot to fly an aircraft to a specific location. The ferry permit was issued on April 26, 2019, and Aircraft was flown to Wings Aviation the same day. The aircraft was disassembled for reasons outside the scope of this litigation and currently remains in a disassembled state at Wings Aviation. No further payments were made to Elite after the Aircraft was flown to Oklahoma City. The remaining outstanding balance on Ace Pools's account was $56,184.62.

## II. Conclusions of Law

Because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Because this is a diversity case, the Court applies Arkansas substantive law. *Murry v. Greenwich Ins. Co.*, 533 F.3d 644, 648 (8th Cir. 2008) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)).

### A. Breach of Contract

Each party claims the other breached a contract. To succeed on a breach of contract claim the plaintiff must "prove the existence of an agreement, breach of the agreement, and resulting damages." *Ultracuts Ltd. V. Wal-Mart Stores, Inc.*, 33 S.W.3d 128, 133 (Ark. 2000). The parties agree that they entered into a contract for Elite to perform upgrades to the Aircraft. No formal written agreement existed. Elite and Ace Pools, through Hollingsworth and Welchel,[1] originally formed the contract in September 2018. The contract was modified several times to change the

---

[1] Welchel also brought a breach of contract counter-claim against Elite. However, the contract was with Ace Pools and Welchel merely acted on behalf of Ace Pools. Welchel did not demonstrate evidence to support an individual breach of contract claim.

7

scope of the upgrades. The contract included an implied agreement that Elite would upgrade the Aircraft in accordance with FAA regulations and return the Aircraft to service. Elite materially breached the contract when Elite drilled holes into the firewall and bulkhead of the Aircraft and installed a UMA lighting system. The drilled holes into the firewall and bulkhead were not compliant with FAA regulations and the light system was installed without an STC or appropriate DER or DAR approval. Ace Pools is entitled to damages for the breach.

When a contract has been breached, the wronged party is entitled to those damages that may fairly and reasonably be considered as arising naturally, or according to the usual course of things, from the breach of the contract itself. *Caldwell v. Guardian Tr. Co.*, 26 F.2d 218, 223 (8th Cir. 1928). The wronged party may recover such special or consequential damages "as may reasonably be supposed to have been in contemplation of both parties at the time they made the contract, as the probable result of a breach of it." *Miles v. American Ry. Express Co.*, 233 S.W. 930, 931 (Ark. 1921); *see* Howard Brill & Christian Brill, *Law of Damages*, § 4.4 (6th ed. 2014). The cost of corrective repairs may be awarded in service contracts when defective work of personal property occurs. Brill & Brill, *Law of Damages*, § 17:4; *see Gray v. Moreland*, 374 S.W.3d 178 (Ark. App. 2010) (awarding airplane owner the costs of having defective paint-job repaired).

Contract damages can be general or consequential. "General damages are those that necessarily flow from the breach. Consequential damages refer to those damages that are only indirectly caused by the breach—instead of flowing directly from the breach, they result from some of the consequences of the breach." *Hobson v. Entergy Ark., Inc.*, 432 S.W.3d 117, 126 (Ark. App. 2014) (citations omitted). On a claim for consequential damages, Arkansas follows a minority rule known as the "tacit agreement" rule. *Fed. Deposit Ins. Corp. as Receiver for First S. Bank v. BKD, LLP*, No. 4:13cv720JM, 2014 WL 12769667, at *3 (E.D. Ark. 2014).

To recover consequential damages on a contract, the plaintiff must prove the defendant knew at the time he entered the contract that his breach would cause the plaintiff to suffer special damages, and that the defendant "tacitly agreed" to assume responsibility for those damages. *Reynolds Health Care Svcs., Inc. v. HMNH, Inc.*, 217 S.W.3d 797, 803-04 (Ark. 2005). In the absence of an express contract to pay special damages, "the facts and circumstances in proof must be such as to make it reasonable for the judge . . . trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part." *Id.* at 804. Whether notice of any such special circumstances was given to the breaching party is a question of fact. *Id.* at 805.

The general damages sought by Ace Pools are $82,728.66 to repair structural elements and $98,631.85 to repair avionics and remove the lighting system. Ace Pools is entitled to $19,125.00 for the cost of repairing the firewall, which are damages arising naturally from the breach. However, Ace Pools did not present sufficient evidence to recover the entire amount of general damages sought. Specifically, the majority of Ace Pools's evidence of damages was based on a repair estimate from Wings Aviation, a competitor of Elite. Wings Aviation worked with Welchel to disassemble the Aircraft and the Court finds Wings Aviation's repair estimates are not credible. Ace Pools has proved general damages of $19,125.00.

The special damages sought by Ace Pools are Ace Pools's lost profits in the summer of 2019. Under the tacit agreement rule, a wronged party must not only prove that the other party knew the breach would cause the wronged party to suffer special damages, but that the other party agreed to assume responsibility for the special damages. *Reynolds Health Care Svcs., Inc.,* 217 S.W.3d at 803-04. The tacit agreement need not be written or express. When not written into the contract, "the facts and circumstances in proof must be such to make it reasonable for the judge or

jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part." *Bank of America, N.A. v. C.D. Smith Motor Co. Inc.*, 106 S.W.3d 425, 431 (Ark. 2003) (citing *Hooks Smelting Co. v. Planters' Compress Co.*, 79 S.W. 1052, 1056 (Ark. 1904)). There is insufficient evidence to show that Elite knew that breaching the contract would cause Ace Pools to suffer lost profits, and no evidence that Elite agreed to be responsible for the lost profits.

Ace Pools's $19,125 general damages will be reduced because of the underlying principles against double recovery and economic waste. "Calculation of damages should make economic sense and should not be practically foolish." Brill & Brill, *Law of Damages*, § 4:9. Further, "Arkansas law does not favor double recoveries." *Schultz v. Walker*, No. 4:09CV00460, 2011 WL 76717, at *2 (E.D. Ark. Feb. 28, 2011) ("Double recovery is abhorrent to our laws, while there is need for individuals to be compensated for a loss, there should not be a recovery greater than the loss." (citation and alterations omitted)). Elite installed the lighting system in the Aircraft and although the system must be removed, Ace Pools has possession of the system. For Ace Pools to receive the benefit of possessing the system, which can be resold, would be a double recovery. Further, requiring Elite to pay for the lighting system would result in economic waste. The cost of the system—excluding Elite's labor and shipping—is $6,077.21. Ace Pools's damages arising out of Elite's breach of contract will be reduced by $6,077.21 to a total of $13,047.79.

### B. Negligence

Ace Pools and Welchel also brought a counterclaim for negligence. "To prevail on a claim of negligence, the plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached the duty, and that the breach was the proximate cause of the plaintiff's injuries." *Duran v. Sw. Ark. Elec. Coop. Corp.*, 537 S.W.3d 722, 726 (Ark. 2018) (citation

omitted). Ace Pools and Welchel failed to present evidence sufficient to support a finding of negligence. Even if Ace Pools and Welchel demonstrated a negligence claim, the policy against double recovery would prevent recovery on both the breach of contract and negligence claims. *See Schultz*, No. 4:09CV00460, 2011 WL 76717, at *2.

### C. Conversion

To establish the common-law tort of conversion, "a plaintiff must prove that the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of or is inconsistent with the owner's rights." *C.A.R. Transp. Brokerage Co., Inc. v. Seay*, 255 S.W.3d 445, 449 (Ark. 2007). Elite purchased the UMA lighting system to be installed in the Aircraft pursuant to its contract with Ace Pools, and so did not demonstrate Ace Pools and Welchel wrongfully committed a distinct act of dominion over any property belonging to Elite. The evidence does not support a finding of conversion.

### III. Conclusion

The Court will award general damages for breach of contract to Ace Pools in the amount of $13,047.79, which the Court finds to be a reasonable amount. All other claims and counterclaims will be dismissed with prejudice. Judgment will be entered separately.

IT IS SO ORDERED this 17th day of August, 2021.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE